UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

───────────────────────────────────

| | |
|---|---|
| | : |
| MARVIN OVERBY, ET. AL. | : |
| | : |
| Plaintiffs, | : |
| | : Case No. 02-CV-1357-B |
| vs | : |
| | : This Document Relates To: |
| TYCO INTERNATIONAL LTD., ET. AL. | : ERISA Actions |
| | : |
| Defendants. | : |

───────────────────────────────────

## CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiffs Marvin Overby, Edmund J. Dunne and Kay M. Jepson, on behalf of themselves

and all other persons similarly situated (the "Participants"), and on behalf of the Tyco International (US)

Inc. Retirement Savings and Investment Plan I, the Tyco International (US) Inc. Retirement Savings and

Investment Plan II, the Tyco International (US) Inc. Retirement Savings and Investment Plan III, the

Tyco International (US) Inc. Retirement Savings and Investment Plan IV, the Tyco International (US)

Inc. Retirement Savings and Investment Plan V, the Tyco International (US) Inc. Retirement Savings

and Investment Plan VI and the Tyco International (US) Inc. Retirement Savings and Investment Plan

VII (together with their predecessor plans,[1] collectively the "Tyco International (US) Inc. Retirement

───────────────────────

[1] As companies were acquired by Tyco International Ltd., the acquired companies' employee benefit plans were changed so that the Tyco International Ltd. Stock Fund was substituted for the acquired companies' stock funds, and the Tyco International (US) Inc. Retirement Committee was substituted as plan administrator for the acquired companies' plan administrators. The acquired companies' plans were eventually merged with one or more of the Plans. The most recent merger was for the Investment Plan for Employees of Mallinckrodt, Inc., which merged with the Plans on December 10, 2002. This action includes all predecessor plans now merged with the Plans.

Savings and Investment Plans" or "Plans"),[2] by their attorneys, allege the following for their Amended

Complaint:

## NATURE OF THE ACTION

1.      Plaintiffs are the individuals identified in ¶¶ 7-14 ("Plaintiffs").  Plaintiffs are Participants

in the Plans, bring this action for Plan-wide relief on behalf of the Plans, and on behalf of a class of all

Participants in the Plans for whose individual accounts the Plans purchased and/or held shares of the

Tyco International Ltd. Stock Fund ("Tyco Stock Fund" or "Fund") from August 12, 1998 to the

present (the "Class").  Excluded from the Class are Defendants herein, directors of Tyco International

Ltd. or Tyco International (US) Inc., members of their immediate families, and the heirs, successors or

assigns of any of the foregoing.  Defendants are the named fiduciary of the Plans and several others

who are deemed "fiduciaries" under the broad definition of fiduciary under section 3(21)(A) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(21)(A).  Plaintiffs

bring this action on behalf of the Plans and the Class pursuant to ERISA § 502(a)(2) and (3), 29

U.S.C. § 1132(a)(2)and (3).

2.      As more fully set forth below, Defendants breached their fiduciary duties to the Plans

and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and

Department of Labor Regulations, 29 C.F.R. 2550.  Defendants breached their fiduciary duties to the

Plans and the Participants in two principal ways: (a) negligently misrepresenting and negligently failing to

---

[2] All seven of the Plans are managed by the same fiduciaries, all offer shares of the Tyco
International Ltd. Stock Fund as a Participant investment option, and the assets of all Plans are held in
one Master Trust.

2

disclose material facts to the Plans and the Participants in connection with the management of the Plans'

assets and (b) negligently permitting the Plans to purchase and hold shares in the Tyco Stock Fund

when it was imprudent to do so.  As a result of these wrongful acts, pursuant to ERISA § 409(a), 29

U.S.C. § 1109(a), Defendants are personally liable to make good to the Plans the losses resulting from

each such breach of fiduciary duty.  Plaintiffs also seek equitable relief.

       3.      Plaintiffs allege these claims in two separate, independent claims.

       a.      As and for Claim I, Plaintiffs allege that the Defendants breached their fiduciary

duties by negligently misrepresenting and negligently failing to disclose material information necessary for

Participants to make informed decisions concerning Plan assets and benefits and the appropriateness of

the Fund as a Plan investment, including, but not limited to, the fact that:

       (i)      senior executives of Tyco International Ltd. received hundreds of

millions of dollars of corporate assets that were not disclosed to Participants and were in violation of

the executives' fiduciary duties to Tyco and its shareholders;

       (ii)      the reported results of operations of Tyco International Ltd. were

consistently materially overstated and not in accordance with Generally Accepted Accounting Principles

("GAAP");

       (iii)      Tyco International Ltd. was engaging in hundreds of undisclosed

corporate acquisitions, at a cost in excess of $8 billion, which misrepresented the basis of Tyco's

growth, caused Tyco to incur substantial interest expense and ultimately resulted in a diminution of

corporate earnings;

        (iv)     Tyco was consistently engaging in improper accounting techniques which were not neutral as to the timing of recognition of revenues and expenses and which had the purpose and effect of maximizing not only reported earnings but the risk that earnings were improper or unsustainable; and

        (v)     the misreporting of financial results, the undisclosed acquisitions and the use of improper accounting techniques to maximize reported earnings made Tyco International Ltd. appear to be a successful turnaround specialist and growth company when that was not the case.

        b.     As and for Claim II, Plaintiffs allege that the Defendants breached their fiduciary duties by permitting the Plans to invest Plan assets in the Tyco Stock Fund while that Fund was not a prudent investment.  The purpose of the Plans was to provide for employee retirement income security.  Claim 2 alleges that it was imprudent for Plans with this purpose to invest over $700,000,000 of Plan assets in the Tyco Stock Fund.  This concentration was imprudent because, among other reasons, (1) Tyco International Ltd. was engaged in a massive, high risk acquisition program involving many disparate industries, (2) Tyco International Ltd.'s accounting was impenetrable and, therefore, the merits of investing Plan assets in the Fund could not reasonably be evaluated, (3) Tyco International Ltd. management was engaged in material unauthorized transactions, and (4) analyst reports concerning Tyco International Ltd. could not be trusted.

## JURISDICTION AND VENUE

        4.     Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

        5.     This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because this is the district where the Plan is administered, where the breaches took place

and where one or more defendants reside or may be found.

## PARTIES

**Plaintiffs**

7.      Lead Plaintiff Marvin Overby is a resident of the State of Illinois and is and was at all

relevant times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C.

§ 1002(7).

8.      Lead Plaintiff Edmund J. Dunne is a resident of the State of Idaho and was at all

relevant times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C.

§ 1002(7).

9.      Lead Plaintiff Kay M. Jepson is a resident of the State of Minnesota and was at all

relevant times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C.

§ 1002(7).

10.      Plaintiff John B. Gordon is a resident of the State of Wisconsin and was at all relevant

times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C.

§ 1002(7).

11.      Plaintiff Virginia Konyn is a resident of the State of Alabama and was at all relevant

times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C.

§ 1002(7).

5

12.     Plaintiff Gary Johnson is a resident of the State of Wisconsin and was at all relevant times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

13.     Plaintiff Karl Peterson is a resident of the State of Michigan and was at all relevant times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

14.     Plaintiff Steve Swanson is a resident of the State of Wisconsin and was at all relevant times a Participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

**Defendants**

15.     Tyco International Ltd. is incorporated under the laws of Bermuda and maintains its principal executive offices at One Tyco Park, Exeter, New Hampshire 03833.

16.     Tyco International (US) Inc. is a wholly owned subsidiary of Tyco International Ltd., incorporated in the State of Nevada, and maintains its principal executive offices at One Tyco Park, Exeter, New Hampshire 03833.

17.     The Tyco International (US) Inc. Retirement Committee ("Committee") is an entity designated as the Administrator of the Plans.  The Committee is called different names in different Plan documents at different times: it is called the "Tyco Retirement Committee" in the Plans' Form 5500 Annual Reports filed with the Internal Revenue Service ("IRS") and the Department of Labor ("DOL"), it is referred to as the "Tyco International, Ltd. Retirement Committee" in some of the Form S-8 Registration Statements filed by Tyco International Ltd. with the Securities and Exchange Commission

("SEC"), and it is identified as the "Tyco International (US) Inc. Retirement Committee" in the Plans'

Form 11-K Annual Reports and in some Form S-8 Registration Statements filed with the SEC.  Upon

information and belief, the Committee includes senior Tyco executives with substantial knowledge of the

business and finances of both Tyco International (US) Ltd. and Tyco International Ltd.  For example,

Tyco's Treasurer, Barbara S. Miller, at one time served on the Committee.  Because of their positions

and day-to-day work experience, their access to internal company reports and memoranda, and their

experience with company accounting and mergers and acquisition practices, the Committee and its

members should have known (1) that Tyco International Ltd. negligently made the materially false or

misleading public statements and negligently failed to disclose material information as alleged below and

(2) that the Fund was an imprudent investment as alleged below.

18.     Robert A. Bent ("Bent") is an employee of Tyco International (US) Inc. and the

"Clerk" of the Tyco International (US) Inc. Retirement Committee.

19.     Kelly Heffernan ("Heffernan") was at all relevant times an employee of Tyco

International (US) Inc. and an authorized signatory of the Tyco International (US) Inc. Retirement

Committee.

20.     At all relevant times, Irving Gutin ("Gutin") was one of three members of the Board of

Directors of Tyco International (US) Inc. and the Senior Vice President in charge of mergers and

acquisitions of Tyco International Ltd.

21.     At all relevant times, Jerry R. Boggess ("Boggess") was one of three members of the

Board of Directors of Tyco International (US) Inc. and the President of the Tyco Fire and Securities

division and was responsible for the business of ADT which Tyco International Ltd. acquired.

22.     At all relevant times, Richard J. Meelia ("Meelia") was one of members of the Board of Directors of Tyco International (US) Inc. and the President of the Tyco Healthcare division and was responsible for the business of U.S. Surgical Corporation which Tyco International Ltd. acquired.

23.     At all relevant times, L. Dennis Kozlowski ("Kozlowski") was the Chairman of the Board of Directors of Tyco International Ltd. as well as its President, Chief Executive Officer and Director (Principal Executive Officer).  Kozlowski was also the President and Chief Executive Officer of Tyco International (US) Inc.

24.     At all relevant times, Mark Swartz ("Swartz") was the Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) of Tyco International Ltd.  Swartz became a Director of Tyco International Ltd. in 2001.

25.     At all relevant times, Mark A. Belnick ("Belnick") was Executive Vice President and Chief Corporate Counsel of Tyco International Ltd.

26.     At all relevant times, Michael Ashcroft ("Ashcroft"), Joshua M. Berman ("Berman"), Richard S. Bodman ("Bodman"), John F. Fort ("Fort"), Stephen W. Foss ("Foss"), Richard A. Gilleland ("Gilleland"), Philip M. Hampton ("Hampton"), James S. Pasman, Jr. ("Pasman"), W. Peter Slusser ("Slusser"), Frank E. Walsh, Jr. ("Walsh"), and Wendy Lane ("Lane") were members of the Board of Directors of Tyco International Ltd.

27.     John Does 1-30 were members of the Committee during the Class Period whose names are not currently known.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action in part as a class action pursuant to Rules 23(a) and (b)(1) and (3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all Participants in the Plans for whose individual accounts the Plans purchased and/or held shares of the Tyco Stock Fund from August 12, 1998 to the present (the "Class Period").  Excluded from the Class are Defendants herein, directors of Tyco International Ltd and Tyco International (US) Inc., members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

29.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class in that Tyco International Ltd.'s public statements represent that it had 108,000 employees in the United States during the Class Period, and a substantial number of these employees were Participants in the Plans for whose account the Plans held shares of the Tyco Stock Fund.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

     a.   whether Defendants were fiduciaries of the Plans and/or the Participants;

     b.   whether Defendants breached their fiduciary duties;

     c.   whether the Plans and the Participants were injured by such breaches; and

     d.   whether the Class is entitled to damages and injunctive relief.

31.     Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

32.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained competent counsel.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

33.     Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

34.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLANS

35.     The Plans are employee benefit Plans within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

36.     The Plans are "defined contribution" or "individual account" Plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's accounts.  Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.

37.     The Plans are "401(k)" voluntary contribution Plans whereby Participants direct the Plans to purchase investments from among the investment options available in the Plans and allocate them to Participants' individual accounts.

38.     The Plans provide several options for investment of Participant contributions including the Tyco Stock Fund.  However, other than the Tyco International (US) Inc. Retirement Savings and Investment Plans I and VII, which, under certain circumstances, required that employer matched contributions be invested in the Fund, the Plans were not required to offer the Fund as an investment option.

39.     The Plans also provide that Tyco International (US) Inc. would make matching contributions in an amount equal to a percentage of a Participant's regular compensation.  Certain of these contributions are invested solely in the Tyco stock Fund.

40.     Tyco International (US) Inc. is the Sponsor of the Plans within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

**<u>DEFENDANTS WERE FIDUCIARIES OF THE PLANS</u>**

**The Committee and its members were fiduciaries**

41.     The Committee is the Administrator of the Plans within the meaning of ERISA §

3(16)(A), 29 U.S.C. § 1002(16)(A), because it was so designated on the Plans' Form 5500 as filed

with the DOL and Forms 11-K filed with the SEC.  The Committee is the "Named Fiduciary" under

ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Moreover, to the extent that the Committee was

delegated responsibilities under the Plans or a procedure specified in the Plans, it is a named fiduciary

under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

42.     The Committee was also a fiduciary because it exercised discretionary authority to

establish investment options under the Plans, including the Fund.  In particular, it had a duty to review

Plan investment policies and alternatives and the selection and performance of those alternatives, and

had the discretion to establish, change and terminate investment options under the Plans.

43.     The Committee was also a fiduciary because it had the duty to investigate fully the

investment options under the Plans, and to elicit from Tyco information necessary for the proper

administration of the Plans sufficient to permit Participants to make proper investment decisions with

respect to the investment options.

44.     The Committee was also a fiduciary because it disseminated to Participants Summary

Plan Descriptions (individually and collectively, "SPD").  Fiduciaries of the Plans are required under

ERISA to furnish certain information to Participants.  For example, ERISA § 101, 29 U.S.C. § 1021,

requires the Plans' Administrator to furnish to Participants the SPD.  ERISA § 102, 29 U.S.C.§ 1022,

provides that the SPD must apprise Participants of their rights and obligations under the Plans.  The

SPD and all information contained or incorporated therein constitute representations in a fiduciary

capacity upon which Participants are entitled to rely in determining the identity and responsibilities of

fiduciaries under the Plans and in making decisions concerning their benefits and investment and management of the Plans' assets allocated to their accounts.

45.     The Committee was also a fiduciary in that it disseminated to Participants prospectuses for the Plans (individually and collectively, "Prospectus") which purported to describe the investment characteristics of Plan investment options.  The Prospectus and all information contained or incorporated therein constitute a representation in a fiduciary capacity upon which Participants are entitled to rely in making decisions concerning their benefits and investment and management of Plan assets allocated to their accounts.

46.     The Committee was also a fiduciary because it signed the Form S-8 Registration Statements (individually and collectively, "Form S-8" or "Registration Statement") pursuant to which Tyco International Ltd. offered shares of Tyco stock to the Plans and the Fund.  According to the SEC's instructions for completing the Form S-8 Registration Statement, "The registrant shall deliver or cause to be delivered to each participant material information regarding the plan and its operations that will enable participants to make an informed decision regarding investment in the plan."  Accordingly, the Form S-8 constitutes a representation in a fiduciary capacity.  The Committee was not required to offer the Fund or Tyco stock as an investment option under the Plans or to sign the Registration Statements, but once it elected to do so, it made the representations in the Registration Statement in a fiduciary capacity.

47.     The Form S-8 and, upon information and belief, the SPD and the Prospectus, incorporated by reference all of Tyco International Ltd.'s SEC filings.  Consequently, the SEC filings were part of the Form S-8, and, upon information and belief, the SPD and the Prospectus.  The

Committee exercised discretion in the disseminating of the Form S-8, the SPD and the Prospectus which incorporated by reference Tyco International Ltd.'s SEC filings to Participants which were intended to communicate to Participants information necessary for Participants to manage their retirement benefits under the Plans.  The Committee was not required to cause the Plans to offer the Tyco Stock Fund as an investment option or to disclose all SEC filings to Participants through their incorporation into Plan documents, but once it elected to do so, it made those disclosures in a fiduciary capacity.

48.     The Committee members were fiduciaries because they operated the Committee and were responsible for all acts of the Committee.

**The other Defendants were fiduciaries**

49.     As more fully alleged below, the other Defendants were <u>de facto</u> fiduciaries of the Plans as a result of their discretionary authority or control over the Plans under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A).  A person or entity is a fiduciary even if the Plans do not name him as such or by its terms assign fiduciary duties to him where, by his conduct, he engages in fiduciary activities.  Those who have discretion over management of the Plans or the Plans' assets are fiduciaries regardless of the labels or duties assigned to them by the language of the Plans.  Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

**The Tyco International (US) Inc. Directors were fiduciaries**

14

50.     The Directors of Tyco International (US) Inc. were fiduciaries pursuant to ERISA § 3(21)(A), 29 U.S.C. 1002(21)(A), in that they exercised discretionary authority or control respecting management of the Plans or management or disposition of its assets.

51.     According to the Form 11-K Annual Report filed on behalf of the Plans, the Directors of Tyco International (US) Inc. appointed, monitored and removed the Tyco employees who were on the Committee and made the investment decisions for the Plans.  In connection therewith, the Directors of Tyco International (US) Inc. had a duty to appoint persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties and to evaluate the merits of the Plans' investment options.  The Directors of Tyco International (US) Inc. also had an ongoing duty to ensure that the persons appointed were performing these duties properly with respect to the selection of investment options and the investment of Plan assets.  Finally, to the extent that the Directors of Tyco International (US) Inc. had information that these appointees needed in order to perform their duties effectively, the Directors had a duty to convey that information to the appointees.  Consequently, the Directors of Tyco International (US) Inc. were fiduciaries.

**Tyco International (US) Inc. was a fiduciary**

52.     Tyco International (US) Inc. was a fiduciary to the extent that its employees served on the Committee within the scope of their employment or to the extent that members of its Board of Directors are fiduciaries.

53.     The Committee, the "Named Fiduciary," and its members were Tyco International (US) Inc.'s agents because the Committee members acted on behalf of Tyco International (US) Inc. On information and belief, all Committee members were Tyco International (US) Inc. employees who

served at the pleasure of the Tyco International (US) Inc. Board without additional compensation.  For example, Tyco's Treasurer, Barbara S. Miller, served on the Committee.  Moreover, pursuant to the Plans, Committee members are indemnified by Tyco International (US) Inc. for any obligations they incur in connection with their service on the Committee.  Based on these facts, Tyco International (US) Inc. had control over the actions of the Committee and its members and is liable for their actions.

54.     Tyco International (US) Inc. was also a fiduciary in that its Board of Directors is a fiduciary as alleged above in that the Board is, by definition, an agent of the corporation.

**Tyco International Ltd. was a fiduciary**

55.     Tyco International Ltd. signed and filed with the SEC the Form S-8 under its own SEC Central Index Key ("CIK") 833444.  As alleged above, this S-8 is a representation to Participants in a fiduciary capacity.

56.     As alleged above, the Form S-8 and, upon information and belief, the SPD and the Prospectus, incorporated by reference all of Tyco International Ltd.'s SEC filings.  Consequently, the SEC filings were part of the Form S-8, and, upon information and belief, the SPD and the Prospectus.  Tyco International Ltd. exercised discretion in disseminating the Form S-8, the SPD, and the Prospectus which incorporated by reference Tyco International Ltd.'s SEC filings to Participants which were intended to communicate to Participants information necessary for Participants to manage their retirement benefits under the Plans.  Tyco International Ltd. was not required to (a) register its securities for an offering to Plan participants, (b) cause the Plans to offer the Tyco Stock Fund as an investment option or (c) disclose all SEC filings to Participants, but once it elected to do so, it made these disclosures in a fiduciary capacity.

57.     Tyco International Ltd. was also a fiduciary because it filed with the SEC the Form 11-K Annual Reports for the Plans under its own SEC Central Index Key ("CIK") 833444.  The purpose of the Plans' Form 11-K Annual Reports filed by Tyco International Ltd. is to convey to Participants material information regarding the Plans and the Tyco Stock Fund as an investment option upon which Participants are entitled to rely in making decisions concerning their benefits and investment and management of the Plans' assets allocated to their accounts.

58.     Tyco International Ltd. was also a fiduciary because it made direct representations to Participants relating specifically to Plan investment options.  For example, it was a fiduciary with respect to the direct representations made by Kozlowski to Participants, as alleged below, in that Kozlowski was acting in the course of his employment.  By way of further example, in the "Update to the Prospectus and Summary Plan Description for the Investment Plan for the Employees of Mallinckrodt Inc." ("Update") (the Mallinckrodt plan was later merged into the Plans), Tyco International Ltd. represented to Participants as follows:

a.      the Update provided "certain additional information regarding Tyco International Ltd.'s common shares";

b.      it directed Participants to the Tyco International Ltd. Form S-8 Registration Statement for further information;

c.      it described Tyco International Ltd. stock "as securities to be offered under the Plan;"

d.      it directed employees to contact Tyco International Ltd. directly for further information about Tyco International Ltd. stock;

e.     it expressly stated that Tyco International Ltd., not the Committee, will

disseminate to Participants the Update; and

f.     it expressly incorporated by reference all of Tyco International Ltd.'s SEC

filings.

59.     Tyco International Ltd. was also a fiduciary because of its control of Tyco International

(US) Inc.  Both Tyco International Ltd. and Tyco International (US) Inc. were controlled by the same

individuals who served as the primary officers and managers for both companies as follows:

a.     L. Dennis Kozlowski was the President and Chief Executive Officer of both

Tyco International Ltd. and Tyco International (US) Inc.

b.     Mark A. Belnick was the Executive Vice President, Chief Corporate Counsel

for both Tyco International Ltd. and Tyco International (US) Inc.

c.     Mark H. Swartz was the Executive Vice President, Chief Financial Officer of

both Tyco International Ltd. and Tyco International (US) Inc.

d.     Jerry R. Boggess was President of Tyco International Ltd.'s Fire and Security

Services division and a Director and Vice President of Tyco International (US) Inc.

e.     Diane Creel was the President of Tyco International Ltd.'s Earth Tech division

and Vice President of Tyco International (US) Inc.

f.      Neil R. Garvey was the President of Tyco International Ltd.'s Tyco Submarine

Systems Ltd. and Vice President of Tyco International (US) Inc.

g.     Stephen B. McDonough was the President of Tyco International Ltd.'s Tyco

Plastics and Adhesives division and Vice President of Tyco International (US) Inc.

18

h.      David P. Brownell was a Senior Vice President of Tyco International Ltd. and a Senior Vice President of Tyco International (US) Inc.

i.      J. Brad McGee was a Senior Vice President of Tyco International Ltd. and a Senior Vice President of Tyco International (US) Inc.

j.      Patricia Prue was the Senior Vice President, Human Resources for Tyco International Ltd. and the Senior Vice President, Human Resources of Tyco International (US) Inc.

k.      Michael A. Robinson was the Senior Vice President, Corporate Treasurer of Tyco International Ltd. and the Treasurer of Tyco International (US) Inc.

60.      Because there was no material difference between the management of the two companies - indeed, Tyco International (US) Inc. was the alter ego of Tyco International Ltd. - Tyco International Ltd. was a <u>de facto</u> fiduciary under ERISA's broad definition of "fiduciary."

**The Directors of Tyco International Ltd. were fiduciaries**

61.      The Directors of Tyco International, Ltd. signed the Form S-8 and many of the SEC filings incorporated by reference in the Form S-8 (and on information and belief, the SPD and Prospectus).  The Directors of Tyco International, Ltd. were fiduciaries of the Plans because of these communications for the same reason that Tyco International Ltd. was a fiduciary.

**Kozlowski, Swartz and Belnick were fiduciaries**

62.      Kozlowski and Swartz signed many of the SEC filings incorporated by reference in the Form S-8 (and on information and belief, the SPD and Prospectus).  Additionally, Kozlowski was a fiduciary because he made direct representations to Participants to be used by them in connection with their decisions concerning investment of Plan assets (as alleged below).  Belnick was a fiduciary

because the proxy statements filed with the SEC as Form 14A, and the notice contained therein, were promulgated by Belnick in his capacity as Executive Vice President and Chief Corporate Counsel. These defendants were fiduciaries of the Plans because of these fiduciary communications for the same reason that Tyco International Ltd. and its directors were fiduciaries.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

63.     Pursuant to ERISA § 404, fiduciaries have a duty to discharge their duties with respect to the Plans prudently and solely in the interests of Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and their Beneficiaries.  A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the Plans, including employer securities, to ensure that each investment is a suitable and proper option for the Plans.  The selection, monitoring and continuation of the investment alternatives under the Plans were subject to the above-described fiduciary duties.

64.     Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), the Plans' fiduciaries had a duty to discharge their duties with respect to the Plans with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plans so as to minimize the risk of large losses.

65.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

66.     Companies typically provide two types of pension plans – (a) a "defined benefit" plan, where the amount of an employee's retirement benefit is a direct obligation of the company which is a set amount (typically based on salary while employed and number of years of employment), and (b) a "defined contribution" plan, such as a 401(k) plan, where the retirement benefit is based solely on the amount invested and the earnings made in an employee's plan account.  Fiduciaries of defined benefit plans, who invest or actively supervise the investment of plan assets, are liable under ERISA for imprudent investments made by the plan, and they are liable for and must make good to the plan any losses suffered by the plan and any loss of benefits suffered by beneficiaries as a result of imprudent investments.  Fiduciaries of defined contribution plans are similarly liable under ERISA § 404(a), 29 U.S.C. § 1104(a), for imprudent investments made by a plan, even where the investment choice is selected by the participant, unless the plan and the fiduciaries comply with the strict requirements of ERISA § 404(c), 29 U.S.C. § 1104(c).  Where the plan and fiduciaries do **not** comply with section 404(c), then the fiduciaries' liability for imprudent investments is the same as the liability of a fiduciary of a traditional pension plan.

67.     Fiduciaries can shift liability for imprudent investments to fiduciaries under Section 404c if, among other things, they meet four specific requirements:

a) they disclose in advance the intent to shift liability to Participants;

b) they ensure that Participants are not subject to undue influence;

c) they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

d) they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law.  In this regard, fiduciaries have a choice – they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

68.     Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) for three reasons as alleged in Claim I below – (i) they failed to disclose in a fiduciary capacity all material information that they were not precluded from disclosing under other applicable law and which was necessary for Participants to make informed investment decisions, (ii) they failed to provide an adequate description of the investment objectives and risk and return characteristics of the Funds, and (iii) they failed to ensure that Participants were not subject to undue influence, and indeed themselves subjected Participants to undue influence.  At the beginning of the Class Period, the Plan held approximately $700 million worth of the Tyco Stock Fund.  This value has been destroyed, and defendants are liable for all losses suffered by the Plan and the fiduciaries.

**CLAIM I:      DEFENDANTS NEGLIGENTLY MISREPRESENTED AND NEGLIGENTLY FAILED TO DISCLOSE MATERIAL INFORMATION**

69.     The allegations of paragraphs 1 through 68 are realleged and incorporated herein by reference.

70.     Pursuant to ERISA § 404, 29 U.S.C. § 1104, Defendants have a duty to discharge their duties with respect to the Plans prudently and solely in the interests of Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and their Beneficiaries. The duty of the fiduciary includes at least:

        a.     a duty not to misinform;

        b.     a duty to inform when the fiduciary knows or should know that silence might he harmful; and

        c.     a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

**Negligent misrepresentations and nondisclosures in SEC filings**

71.     Defendants breached their fiduciary duties by negligently misrepresenting and negligently failing to disclose information in the Tyco International Ltd. SEC filings- as incorporated by reference in the Form S-8, and, upon information and belief, the Prospectus, and the SPD - which the Defendants should have known were misleading.

**A.     Negligent Failure to Disclose to Participants Material Information Concerning Related Party Transactions**

**Facts Concerning the Related Party Transactions**

72.     During the Class Period, Tyco International Ltd. ("Tyco") entered into a series of unauthorized transactions involving, among other things, tens of millions of dollars in forgiven loans and so-called "gross-up" payments to executive officers of Tyco International Ltd.; tens of millions of

dollars in credit lines and loans to executive officers of Tyco International Ltd.; an executive relocation plan, and other related party transactions.

73.     Among the unauthorized benefits which Defendant Kozlowski received were the following:

(a)     Kozlowski received interest-free borrowings under relocation programs in the approximate amount of $61,690,628;

(b)     Kozlowski received bonuses in the amount of $32,976,000 from a Tyco bonus program, and an additional $25,566,610 from a bonus program of Tyco subsidiary ADT;

(c)     Kozlowski received approximately $106,000,000 of Tyco funds to pay for donations made in his name;

(d)     Kozlowski received loans in the approximate amount of $55,900,000 by August of 1999 in connection with Tyco's Key Employee Loan Program, which loans were taken for purposes other than those authorized by the program; and

(e)     Kozlowski received fine art and other residential decorations for his homes, used Tyco funds to pay for personal expenses and engaged in personal real estate transactions with Tyco funds in amounts not presently fully accounted for.

74.     Among the unauthorized benefits which Defendant Swartz received were the following:

(a)     Swartz received relocation loans in the approximate amount of $20,992,000;

(b)     Swartz received improper bonuses in the amount of $16,611,000 from a Tyco bonus program, and an additional $12,844,632 from a bonus program of Tyco subsidiary ADT; and

(c)     Swartz received the benefit of a reduction of his indebtedness under Tyco's Key Employee Loan Program in the amount of $12,500,000 through unauthorized and improper entries in connection with the loan program.

75.     Defendant Belnick, Chief Corporate Counsel of Tyco International Ltd., accepted unauthorized, large cash and restricted stock bonuses from Defendant Kozlowski, including items valued at approximately $20 million in the calendar year 2000 alone.  Defendant Belnick also received unauthorized interest-free loans in excess of $10 million under the executive relocation loan program in effect at Tyco International Ltd.  Defendant Belnick also received excessive compensation under an unauthorized employment agreement.

76.     Tyco International Ltd. made an unauthorized payment in the amount of $20 million to Defendant Frank E. Walsh, Jr., a director of Tyco International Inc., in connection with the acquisition of CIT Group, Inc.  $10 million of the $20 million amount was to be retained by Defendant Walsh and $10 million was to be contributed to a charity in Defendant Walsh's name.

### Negligent Misrepresentations in SEC Filings Concerning Related Party Transactions

77.     Tyco made statements to Participants which purported to disclose the complete compensation of Defendants Kozlowski, Swartz, Belnick and Walsh.  These statements were made in proxy statements and SEC filings on Forms 14A and 10-K.  For example, the proxy statements included in Tyco's SEC filings on Form 14A which were filed with the SEC on March 1, 2000 and March 27, 2001, respectively, purported to disclose the compensation of all of Tyco's directors, including Defendants Kozlowski, Swartz and Walsh, and the compensation of Belnick, Tyco's Chief

Corporate Counsel.  Each of the proxy statements contained a detailed account of the compensation of all of Tyco's directors and key executives, including under subheadings and titles "Summary of Directors' Compensation," "Executive Officers," and "Executive Compensation/Summary Compensation Table."

78.     The SEC filings which were transmitted to Participants negligently failed to disclose the unauthorized payments to Kozlowski, Swartz, Walsh and Belnick as described above.

79.     Each of Tyco's SEC filings during the Class Period violated GAAP for negligently failing to comply with the disclosure requirements pertaining to related party transactions.  Statement No. 57 of the Financial Accounting Standards Board requires that disclosure be made of transactions between an issuer and certain categories of entities and individuals.  Included among the categories of individuals and entities as to whom transaction disclosure is required by FASB No. 57 is the issuer's management, which is defined in part as "members of the board of directors, the chief executive officer, chief operating officer and vice presidents in charge of principal business functions."  FASB No. 57 ¶ 24.  The payments to Kozlowski, Swartz, Belnick and Walsh alleged above constituted related party transactions as to which disclosure was required but negligently not made under FASB No. 57 and GAAP.

### The Individual Defendants Should Have Known of the Misrepresentation and Omission of Material Facts Concerning the Unauthorized Payments

80.     Defendant Kozlowski should have known of the material facts set forth above because he received the benefits of the payments and other transactions and initiated those transactions.

Defendant Kozlowski also should have known of the material facts concerning Swartz, Belnick and Walsh because he participated in each of these transactions.

81.     Defendant Swartz should have known of the material facts alleged above because he received the benefits of the payments and other transactions, and also because as chief financial officer of Tyco, he had a duty to be informed concerning uses of corporate funds such as the payments and other material related party transactions described herein.

82.     Defendant Belnick should have known of the material facts alleged above because he received the benefits of the payments and other transactions, and also because as chief corporate counsel of Tyco, he had a duty to be informed concerning uses of corporate funds such as the payments and other material related party transactions described herein.

83.     Defendant Walsh should have known of the $20 million payment to him in connection with the CIT Group acquisition because he received the payment.  Defendant Walsh, moreover, should have known of the other unauthorized payments and the other publicly-undisclosed material related party transactions described herein because, according to Defendants:

> As Tyco's designated "Lead Director," Walsh served as the primary liaison between Tyco's management and the Company's independent directors.  Walsh also served as a member of the Board's Corporate Governance and Nominating Committee, and previously served on the Compensation Committee, responsible for determining the compensation and benefits of Tyco's management.

84.     Each of the Individual Defendants named herein other than Defendants Kozlowski, Swartz, Walsh and Belnick, as well as the Committee, should have known of the unauthorized payments because each of these Individual Defendants had, by virtue of their previously described positions with Tyco, access to information about Tyco's business, operations, products, trends,

27

markets, prospects and financial statements as to make these facts available to them in the exercise of

reasonable diligence.  Defendant Boggess and, on information and belief, other Individual Defendants

were also beneficiaries of unauthorized payments.  These Individual Defendants, moreover, by virtue of

their previously described positions with Tyco, had access to senior corporate executives, through

attendance at management and Board of Directors meetings and meetings of committees thereof, and

had access to reports and other information provided to them in connection with such meetings, as to

make these facts available to them in the exercise of reasonable diligence.

**B.      Negligent Failure to Disclose to Participants Material Information
          Concerning Acquisitions by Tyco International Ltd.**

**Facts Concerning Acquisitions by Tyco International Ltd.**

85.      During the Class Period, Tyco International Ltd. made over 700 undisclosed corporate

acquisitions at an aggregate cost in excess of $8 billion, which acquisitions were not disclosed until

February 4, 2002, months and in some cases years after the consummation of these acquisitions.

86.      Moreover, for June, 2000, in restating the Company's financial statements, Defendants

failed to disclose material information about hundreds of undisclosed acquisitions-which cost more than

twice as much as the acquisitions defendants did disclose during the Class Period.

87.      On February 4, 2002, defendants admitted that, throughout the Class Period, the

Company paid nearly $8 billion for more than 700 acquisitions that were never disclosed to the public

or in the Company's public filings.  Defendants further revealed that these undisclosed acquisitions cost

over 100% more than the transactions that had been disclosed, based on a price calculated as a

multiple of the acquired company's revenues.

88.     Throughout the Class Period, Defendants continued to represent that acquisitions "will be immediately accretive to Tyco earnings."  However, the undisclosed transactions had a substantial negative impact on Tyco's earnings and free cash flow.  The undisclosed acquisition of more than 700 companies for more than $8 billion ultimately caused Tyco to incur significant interest costs which diminished Tyco's fiscal 2002 earnings in a material amount and damaged Tyco's credit rating.

89.     As a result of Tyco's true undisclosed free cash flow position, Tyco was forced to radically increase its short-term borrowing which, inter alia, cut $900 million, or 45 cents per share, from the previously-expected earnings for the Company in fiscal 2002.

90.     As a result of Defendants' failure to disclose over 700 undisclosed acquisitions and their false and misleading statements concerning the Company's ability to turn the companies it acquired into profitable enterprises, Defendants negligently misrepresented to Participants that Tyco only purchased other companies with significant revenue streams that would immediately increase net earnings and free cash flow for the Company when this was not the case.

**Negligent Misrepresentations Concerning Acquisitions by Tyco International Ltd.**

91.     Tyco's Annual Reports on Form 10-K for the fiscal years ended September 30, 1998, 1999 and 2000, respectively, negligently purported to describe Tyco's material acquisitions during those financial periods, including under the headings "Business" and in a lengthy section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations."  None of the Annual Reports on Form 10-K, however, disclosed the over 700 corporate acquisitions which cost Tyco in excess of $8 billion.

92.     Tyco's SEC filings during the Class Period, such as Tyco's Form 10-K for the fiscal year ended September 30, 1999, negligently misrepresented that Tyco's then-increasing earnings were the product of Tyco's ability to identify troubled but promising companies, acquire them and, through sophisticated management techniques and economies of scale, turn the acquired companies into profitable enterprises whose success was reflected in Tyco's ever-improving earnings performance. These statements negligently misrepresented that Tyco had acquired and would continue to acquire other companies which would immediately be accretive to the Company's earnings and, consequently, that the Company's free cash flow position would not require it to tap into its high-interest emergency credit facilities.  For example, Tyco's Form 10-K for the fiscal year ended September 30, 1999, negligently misrepresented that:

> Tyco's strategy is to be the low-cost, high quality producer and provider in each of its markets.  It promotes its leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products. **_Combining the strengths of its existing operations and its business acquisitions_**, Tyco seeks to enhance shareholder value through increased earnings per share and strong cash flows. [Emphasis added.]

> **The Individual Defendants Should Have Known of the Misrepresentation and Omission of Material Facts Concerning Acquisitions by Tyco International Ltd.**

93.     Each of the Individual Defendants and, therefore, the Committee should have known that Tyco failed to disclose that it acquired over 700 companies, at an aggregate cost in excess of $8 billion, and the impact of those acquisitions on Tyco and its cash flow.  (a) Defendant Kozlowski should have known that about these acquisitions because, as Chief Executive Officer, he was involved in the selection of these acquisitions and the negotiations concerning the acquisitions.  Defendant Kozlowski also signed Tyco's SEC filings during the Class Period.  (b) Defendant Gutin was equally

knowledgeable because he was in charge of mergers and acquisitions for Tyco.  (c) Defendant Swartz should have known of these acquisitions and their financial impact, and of the fact that these acquisitions were not being contemporaneously disclosed, because Swartz was Tyco's chief financial officer with primary responsibility to account for acquisitions and to prepare and file with the SEC financial statements which properly accounted for such acquisitions.  (d) Defendant Boggess should have known because he was responsible for all acquisitions made by the Tyco Fire and Security division.  (e) Defendant Meelia should have known because he was responsible for all acquisitions made by the Tyco Healthcare division.  (f) In the case of the other Individual Defendants named herein, each of these defendants should have known that Tyco was acquiring over 700 companies at a cost of over $8 billion without contemporaneously disclosing these transactions and the economic impact of these transactions in SEC filings because each of these Individual Defendants had, by virtue of their previously described positions with Tyco, access to information about Tyco's business, operations, products, trends, markets, prospects and financial statements as to make these facts available to them in the exercise of reasonable diligence.  These Individual Defendants, moreover, by virtue of their previously described positions with Tyco, had access to senior corporate executives, through attendance at management and Board of Directors meetings and meetings of committees thereof, and had access to reports and other information provided to them in connection with such meetings, as to make these facts available to them in the exercise of reasonable diligence.

**C.      Negligent Failure to Disclose to Participants Material Information
         Concerning Improper Accounting**

**Facts Concerning Improper Accounting**

94.      In addition to the hundreds of undisclosed acquisitions, even in the case of acquisitions

which were timely disclosed, Defendants misled Participants by negligently misrepresenting that the

accounting for acquisitions was in compliance with GAAP and resulted in the results of operations of

Tyco being fairly presented in accordance with GAAP, because of the utilization of the following

improper accounting practices, among others:

(a)      Tyco wrote down collectible receivables of acquired companies, which would

lead to an increase in income when subsequently collected;

(b)      Tyco wrote down valuable inventory of acquired companies, which would lead

to an increase in income in later periods;

(c)      Tyco wrote down valuable fixed assets of acquired companies, which would

lead to an increase in income when future depreciation expenses were reduced;

(d)      Tyco capitalized operating expenses, such as spare parts and operating

supplies;

(e)      Tyco adjusted inventory and bad debt reserves to maximize income; and

(f)      Tyco restructured reserves permitting Tyco to release reserves to increase

future income.

95.      Tyco also overstated income following acquisitions, including, for example, the  income

relating to the acquisitions of Raychem (which closed the first day of the Class Period) AMP, Inc. and

U.S. Surgical Corp.  Tyco management, including Kozlowski, systematically encouraged the acquired

entity to increase current expenses and reserves prior to closing which resulted in the acquired entity's

pre-acquisition results of operations being depressed.  Tyco then inflated the post-acquisition entity's

(now part of Tyco) income and other results after closing by reversing charges which should not have

been taken prior to the acquisition and by reducing expenses post-closing.

96.     Tyco improperly recognized as income excess reimbursements from residential security

monitoring contracts that it purchased from independent dealers rather than recognizing them over the

life of the contracts.

97.     Tyco improperly avoided paying United States income taxes on rebates from customers

by having the customers send the rebate checks to customers outside of the United States.

**Negligent Misrepresentations Concerning Accounting Which Was Designed to
Maximize Reported Earnings of Tyco International Ltd.**

98.     The following financial statements were inaccurate in a material respect when originally

filed with the SEC:

(a)     Tyco's Income Statement contained in the Form 10-K it filed with the SEC on

December 10, 1998, for the fiscal year ended September 30, 1998;

(b)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on

February 16, 1999, for the three month period ended December 31, 1998;

(c)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on

May 17, 1999, for the three month period ended March 31, 1999;

33

(d)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on August 9, 1999, for the three month period ended June 30, 1999;

(e)     Tyco's Income Statement contained in the Form 10-K it filed with the SEC on December 13, 1999, for the fiscal year ended September 30, 1999;

(f)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on February 11, 2000, for the three month period ended December 31, 1999;

(g)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on May 14, 2000, for the three month period ended March 31, 2000;

(h)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on August 14, 2000, for the three month period ended June 30, 2000;

(i)     Tyco's Income Statement contained in the Form 10-K it filed with the SEC on December 21, 2000, for the fiscal year ended September 30, 2000;

(j)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on February 13, 2001, for the three month period ended December 31, 2000;

(k)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on May 11, 2001, for the three month period ended March 31, 2001;

(l)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on August 13, 2001, for the three month period ended June 30, 2000;

(m)     Tyco's Income Statement contained in the Form 10-K it filed with the SEC on December 29, 2001, for the fiscal year ended September 30, 2001;

(n)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on February 14, 2002, for the three month period ended December 31, 2001;

(o)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on May 15, 2002, for the three month period ended March 31, 2002;

(p)     Tyco's Income Statement contained in the Form 10-Q it filed with the SEC on August 14, 2002, for the three month period ended June 30, 2002.

99.     Each of these financial statements was not, as originally portrayed, prepared in compliance with Generally Accepted Accounting Principles ("GAAP").  In particular, these financial statements overstated income and understated expenses for the reasons alleged above, among others.

100.     For example, Tyco's Annual Reports on Form 10K for the fiscal years ended September 1998, 1999, 2000 and 2001, stated that all of the financial statements contained therein were prepared in accordance with GAAP and presented fairly the results of operations of Tyco.

101.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a given point in time.

102.     SEC Regulation S-X (17 C.F.R. and section 210.4-01 (a)(l)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote and other disclosures.  Regulation S-X also requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements (17 C.F.R. section 210.10-01(a)).

103.    Those Tyco financial statements which were filed with the SEC during the Class Period, violated at least the following provisions of GAAP:

(a)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise (Financial Accounting Standards Board ["FASB"] Statement of Financial Concepts ["Concept"] No. 1, ¶ 34);

(b)    The concept that financial reporting should provide information about economic resources of an enterprise, the claims to those resources …and the effects of transactions, events and circumstances that change resources and the claims to those resources. (Concept 1 ¶ 40);

(c)    The concept that financial reporting should provide information about how management of an enterprise has discharged it stewardship to owners …for the use of enterprise resources entrusted to it. (Concept 1 ¶ 50);

(d)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. (Concept 1 ¶ 42);

(e)    The concept that information should be reliable as well as relevant is a notion that is central to accounting. (Concept 2 ¶ 58);

(f)    The concept that reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user, which come through verification, that it has representational quality. (Concept 2 ¶ 59);

(g)     The concept that freedom from bias, both in the measure and the measurement method, implies that nothing material is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (Concept 2 ¶ 79); and

(h)     The concept that conservatism is a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (Concept 2 ¶ 95); and

(i)     The concept that the best way to avoid the injury to investors is to try to ensure that what is reported represents what it purports to represent. (Concept 2 ¶ 97).

104.     Each of the quarterly and annual financial statements which were filed with the SEC during the Class Period by Tyco were represented to have been prepared in accordance with GAAP and the rules and regulations of the SEC. For the reasons alleged above and others,  Tyco's financial statements were not prepared in compliance with GAAP and did not fairly present Tyco's results of operations when those financial statements were originally filed and publicized (and prior to the restatement of those financial statements as discussed herein).  Tyco has restated numerous of its financial statements previously issued during the Class Period.  Such restatements are admissions by Tyco that the originally issued reports contained material misstatements and/or omissions.  Accounting Principles Board ("APB") Opinion No. 20 (Accounting Changes).  ¶¶ 7, 10, and 13 state that a restatement is required due to a change in accounting principle, a change in an accounting estimate or "…an oversight or misuse of facts that existed at the time the financial statements were prepared." Disclosures accompanying the restated financial statements indicate that the reasons for the restatements was due to an "…oversight or misuse of facts that existed at the time the financial

statements were prepared."   Also, APB No. 9 (Reporting the Results of Operations).   ¶ 18 requires

that when comparative statements are presented, adjustments should be made in the amounts of net

income and components thereof and retained earnings and other balance for the periods reported

therein.  A restatement would not be made if the results were not material.

105.   Those Tyco financial statements identified above contained materially inaccurate results

of operations when originally filed with the SEC and made available to Participants, as demonstrated by

the subsequent restatement of those financial statements.  As originally filed, these financial statements

also violated GAAP in that Tyco therein:

(a)   engaged in the improper write-down of receivables of acquired companies,

which would be charged to purchase accounting prior to the acquisition and when collected after the

acquisition recorded to income;

(b)   engaged in the improper write-down of the inventory of acquired companies,

which would be charged to purchase accounting prior to the acquisition and when sold after the

acquisition recorded as income;

(c)   engaged in the improper write-down of fixed assets and goodwill of the

acquired companies prior to the acquisition which would be charged to purchase accounting while

future depreciation expenses are reduced;

(d)   engaged in the improper capitalization's of expenses, such as spare parts and

operating supplies, after the acquisition; and

(e)   engaged in the improper use of restructuring reserves prior to the acquisition

and the reversal of potions of these reserves to income after the acquisition.

(f)      failed to engage in a non-neutral approach to Tyco's accounting.  Since at least 1997, it engaged in overly aggressive accounting decisions with respect to acquisitions for the purpose of inflating earnings.

### The Individual Defendants Should Have Known of the Misrepresentation and Omission of Material Facts Concerning Improper Accounting

106.     Defendant Kozlowski should have known of the improper accounting during the Class Period as Tyco's chief executive officer.  Defendant Gutin should have known because he was in charge of mergers and acquisitions.  Defendant Swartz was in charge of the accounting for acquisitions and for the preparation and filing of financial statements which were supposed to fairly present Tyco's results of operations, including with respect to acquired entities.  Each of the other Individual Defendants should have known of the improper accounting by Tyco during the Class Period because each of these Individual Defendants had, by virtue of their previously described positions with Tyco, access to information about Tyco's business, operations, products, trends, markets, prospects and financial statements as to make these facts available to them in the exercise of reasonable diligence.  These Individual Defendants, moreover, by virtue of their previously described positions with Tyco, had access to senior corporate executives, through attendance at management and Board of Directors meetings and meetings of committees thereof, and had access to reports and other information provided to them in connection with such meetings, as to make these facts available to them in the exercise of reasonable diligence.

**Negligent description of investment objectives and risk characteristics of the Fund**

39

107.     During the Class Period, Defendants negligently made misrepresentations concerning the investment objectives and risk and return characteristics of the Tyco Stock Fund as follows:

a.     In a document entitled "Your Tyco Retirement and Savings Plan Investment Options," Defendants negligently represented that Participants who invest in the Fund "are trying to increase the value of your investments over the long term by investing in the common stock of your company."

b.     In a document describing the investment characteristics of the Fund, Defendants negligently represented that the Fund performance "depends solely on the performance of a single stock" and that Participants should invest only "if interested in sharing in the long-term growth of" Tyco stock.

108.     These statements were materially false and misleading in that they failed to disclose that the performance of the Fund depended in part upon the impact of the negligent misrepresentations and nondisclosures on the value of the Fund.

**Negligent misrepresentations by Kozlowski directly to Participants**

109.     Kozlowski disseminated a series of letters and memoranda to Participants relating to the business and financial condition of Tyco International Ltd. and the value of the Fund which negligently misrepresented and failed to disclose material information necessary for Participants to make investment decisions concerning Plan investment options, which had the effect of inducing Participants to direct the Plans to maintain and increase their investments in the Fund and which exerted undue influence over Participants as follows:

   a.  In a letter to Tyco employees dated November 9, 1999, commenting on questions about Tyco's accounting practices which caused a decline in Tyco's stock price, Kozlowski negligently misrepresented that: "Tyco will emerge from this episode even stronger than before. All things considered, this is a very exciting time for Tyco and I am confident in our future."

   b.  In a memo to employees dated October 18, 2001 to which was attached Tyco's fiscal year 2001 earnings press release detailing the negligently misrepresented revenues and earnings alleged above, Kozlowski further negligently misrepresented that "Tyco's growth strategy of having a diversified mix of businesses that continue to maintain strong organic growth, of generating impressive cash flow results and of acquiring and successfully integrating businesses all led to Tyco's excellent FY 2001 results," that "Tyco's acquisition strategy continues to be successful," that the acquisitions "have made our company stronger and more successful," and that Tyco is "well positioned to meet our goals for FY 2002."

   c.  In a memo to employees dated January 17, 2002, Kozlowski negligently misrepresented that Q1 earnings were 74 cents per share, a 17% increase, that sales were $10.1 billion, a 25% increase, that these results illustrated Tyco's strong business performance and that "continuing to organically grow our businesses" would help Tyco meet and exceed its performance goals.

   d.  Notwithstanding his memo lauding Tyco's acquisition strategy just three months before, on January 20, 2002, Kozlowski sent a memo to employees announcing a plan to break Tyco up into four independent companies.  Kozlowski negligently misrepresented that the purpose of this plan was to "close the gap between Tyco's market value in recent years and the value of [Tyco's]

businesses."  Kozlowski further negligently misrepresented that this breakup would permit employees to build their own futures on the "foundation of our success together at Tyco."

   e.  In a letter to employees dated January 31, 2002, Kozlowski negligently misrepresented that "[w]e believe that Tyco's accounting practices are sound," and that critics of Tyco "like to throw around a lot of complicated jargon."

   f.  On February 5, 2002, Kozlowski sent a letter to employees that negligently misrepresented that the news about Tyco's financial disclosures was incorrect, that "unsettling false claims" had been made against Tyco, and that employees should be "reassured that our accounting disclosures are appropriate and follow generally accepted accounting practices...."

   g.  In a memo to employees dated February 6, 2002, Kozlowski negligently misrepresented that Tyco's "credibility has been under attack, unfairly," that the "press has given incorrect reports," that "the fundamentals at Tyco have never been stronger," that Tyco will provide "more detail concerning our accounting (although not required because Tyco's current and past disclosures are completely appropriate)" and that Tyco's "accounting practices are solid, our company is sound, and our services are second to none."

   h.  On March 14, 2002, Kozlowski sent to all employees a memo in which he negligently misrepresented that "Tyco's accounting disclosures have always been highly detailed and will continue to be" and that "other large companies are following our lead."

   110.  The forgoing statements by Kozlowski were false and misleading in that, as alleged above, Tyco negligently misrepresented its financial results, its accounting practices were inappropriate,

the company was not as strong as represented, the acquisition strategy had led to serious problems, and the criticisms of Tyco were appropriate.

**Defendants' breach of fiduciary duties caused the loss**

111.    The Plans, and the Participants acting on behalf of the Plans, relied upon, and are presumed to have relied upon, Defendants' misrepresentations and nondisclosures to their detriment.

112.    As a consequence of Defendants' misrepresentations and nondisclosures, the Plans suffered losses.

113.    Defendants are personally liable to make good to the Plans any losses to the Plans resulting from each breach.

114.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

115.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief.

**CLAIM II:    THE TYCO STOCK FUND WAS AN IMPRUDENT INVESTMENT**

116.    The allegations of paragraphs 1 through 115 are realleged and incorporated herein by reference.

117.    As set forth in paragraph 68 above, Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c), so Defendants remained liable for all imprudent investments in the Fund.

118.    Defendants breached their fiduciary duties as alleged above by allowing the Plans to purchase and hold shares in the Tyco Stock Fund worth in excess of $700 million during the Class Period, and by allowing the Tyco Stock Fund to remain an investment option under the Plans, because

43

this massive investment in the Tyco Stock Fund was an imprudent investment for Plans whose purpose was to provide for employee retirement income security.

119.    At all relevant times, Defendants should have been aware of at least the following publicly disclosed facts which would have led a reasonable investment manager to conclude that a massive investment in the Tyco Stock Fund was an imprudent, high risk investment for the Plans whose purpose was to provide for employee retirement income security.  In particular, Defendants should have known that (1) Tyco was engaged in a massive, high risk acquisition program involving many disparate industries, (2) Tyco's accounting was impenetrable and, therefore, the merits of investing Plan assets in the Fund could not reasonably be evaluated, and (3) analyst reports concerning Tyco could not be trusted.  These facts demonstrate that the Fund was not a prudent investment for such a massive amount of Plan assets:

a.    An article appearing in <u>The Wall Street Journal</u> on January 17, 1997, entitled "Tyco International Isn't Playing, It's Out on the Prowl: No Relation to Elmo, This Industrial Firm Has an Ambitious Acquisition Strategy," reported as follows (emphasis added):

> Through some 65 acquisitions over the past four years, Mr. Kozlowski has diversified Tyco's businesses out of its sprinkler and fire-security systems, which were subject to the volatility of the U.S. construction market. He imposes a strict rule for new acquisitions: They must be accretive to per-share earnings immediately. So far, none has broken that rule, despite the often-dilutive combinations orchestrated by merger-manic Wall Street. "**One of our board members is looking at whether we are eligible for the Guinness Book of World Records**," says Mr. Kozlowski. . . .
>
> It may be tougher for Tyco to find new acquisitions as it continues to grow. "As you get larger, it takes more to keep producing the same kind of percentage returns," says board member Phil Hampton. "Either you do lots of small deals or you have to find larger ones that make sense. Those are harder to do because there are fewer of them and there is greater risk in each one of them."

The company's aggressive acquisition strategy is made possible mainly by a significant earnings improvement over the last several years. In 1995, the Council of Institutional Investors, a Washington - based association of pension funds, **named Tyco's five-year earnings record as one of the worst in the sector**. But earnings began looking up significantly over the past three years. For the year ended June 30, the company posted net income of $310.1 million, or $2.03 a share, up from $214 million, or $1.43 a share, in the prior year. Revenue rose to $5.1 billion from $4.5 billion.

The earnings growth has been fueled in part by fat - and specific - incentives offered to managers. A typical division head will draw 80% of his compensation from incentives, and a plant manager about 50%.  In all cases bonuses begin only after a 15% earnings increase in the section for which the manager is directly responsible, and rise as profit does.

"**That strategy is "more aggressive than most**," says Jerry McAdams, practice leader at consultants Watson Wyatt Worldwide in Washington.

b.      An article appearing in <u>The New York Times</u> on May 22, 1997, entitled "Tyco International finds success in an acquisition binge," reported as follows (emphasis added):

Tyco – a conglomerate that produces everything from fire hydrants to Curad bandages (but not Tyco Toys) – made some 65 acquisitions between 1993 and the end of last year, purchases that by the end of its fiscal year last June 30 had pushed annual revenues to more than $5 billion. . . .

The deal is the fourth Tyco has announced since March, just under $8 billion in cash and stock transactions that when completed will add nearly $4 billion in revenue and about 10,000 employees to its current base.

**Ordinarily, that kind of a binge may prompt concerns that Tyco is trying to do too much too fast**. Indeed, investors may have been thinking along those lines yesterday. Tyco's stock, which closed on Monday at $62.75, fell $l.125 on the  New York Stock Exchange yesterday, to $61.625, taking $11 million off the value of the deal.

c.      An article appearing in <u>The Wall Street Journal</u> on October 14, 1999, entitled "Tyco International Shares Drop 6.2% On Report Critical of Firm's Accounting," reported as follows (emphasis added):

Tyco International Ltd. stock dropped more than 6% yesterday before being halted, after word spread of a recently issued report critical of the company's accounting practices authored by a Dallas money manager who frequently shorts stocks. . . .

The critical report was included in "Behind the Numbers," a newsletter published by David W. Tice, who also manages the Prudent Bear Fund. Mr. Tice said his fund hadn't taken a short position on Tyco.

**Mr. Tice's report focused on Tyco's practice of taking large acquisition-related charges, which he said obscures the company's actual results. He said he found at least two instances in which Tyco may have over-reserved for costs associated with severance pay and facilities closures, which raises the issue of whether management could later use those excess reserves to pump up profits.** . . .

**Some investors have found it difficult to follow the company's results through its rapid-fire dealmaking**. This year alone, Tyco has done more than $14 billion worth of deals, and it often employs the so-called pooling accounting method, which merges the two companies' financial statements, requiring all past results to be restated. Pooling recently has come under fire from accounting regulators as potentially misleading. Further adding to the confusion, Tyco, which is based in Bermuda but managed from Exeter, N.H., changed its fiscal year end last year, giving it a truncated fiscal 1998 of nine months.

       d.    An article appearing in <u>Bloomberg News</u> on October 14, 1999, entitled "Tyco

Plunges After Denying Accounting Speculation," reported as follows (emphasis added):

Tyco set up the call to deny the allegations made by analyst and mutual fund manager David Tice, who's known for making bets that stocks will decline. His report **helped generate speculation on Internet message boards that Tyco may have "accounting irregularities**." . . .

**Tice contends that when Tyco takes charges after making acquisitions, it puts the money aside in reserve and then uses some of it later to pump up profit**. Tyco denied it does so and said it would ask the U.S. Securities and Exchange Commission and the New York Stock Exchange to identify the source of the speculation. In an interview, Kozlowski said it was "premature" to comment on action against any individual. . . .

Acquisition Binge

**Tyco's stock gain has been driven by about $30 billion in acquisitions the company made in the past three years**. The company's strategy is to buy companies that immediately add to profit in its four main units -- electronics and electrical products, disposable medical products, security and fire systems, and industrial valves. . . .

Tice publishes a newsletter titled "Behind the Numbers." The newsletter provides "sell" recommendations to money managers and costs $10,000 a year. . . .

In the newsletter, Tice said Tyco convinces investors the company's profit "is growing at a gangbuster rate" by excluding charges and accruals from its financial results.

"The only way (the growth rate) is possible is to blindly accept the notion that the millions in acquisition-related charges that recur so monotonously are one-time phenomena," Tice wrote. "Call us doubting Thomases, but we do not buy it."

e.    An article appearing in The Wall Street Journal on October 15, 1999, entitled

"Tyco Sleuth Has History Of Uncovering Bad Numbers," reported as follows (emphasis added):

Albert J. Meyer, an accounting sleuth, took a huge bite out of Tyco International Ltd.'s shares over the past two days after he penned a report that questioned the accounting practices of the highly acquisitive conglomerate. . . .

In a nine-page, ultratechnical report released Monday to about 200 subscribers of Mr. Tice's "Behind the Numbers" newsletter, Mr. Meyer questioned whether Tyco's operating results were really as rosy as portrayed in its published accounts. In particular, he focused on the large number of "one-time charges" Tyco took after many acquisitions, which were being widely ignored by investors. The report also contended that the charges could result in "cookie- jar" reserves that Tyco might use to enhance earnings.

"You have to believe all these restructuring charges have no meaning to believe this thing is really growing at double-digit rates," Mr. Meyer says. The mild-mannered accountant hastens to add that he is merely trying to point out that some of Tyco's accounting may be aggressive, and is not accusing the conglomerate of fraud or equating it with New Era in any way. . . .

Another section of the report claimed that Tyco's cash flow wasn't actually as strong as portrayed, saying it would have been about flat in the company's fiscal nine months ended June 30 if Tyco had paid certain taxes and other items it owed. The report said cash flow including these items would have been about $1.7 billion, not the $2.1 billion Tyco reported.

f.    An article appearing in The Wall Street Journal on October 22, 1999, reported

as follows (emphasis added):

Tyco's stock fell more than 21% over three days on investor nervousness sparked by the bearish report. The money manager, David W. Tice, declined to say whether the SEC had contacted him, but said he believed the inquiry was related to a call by Tyco management for an investigation into the reasons behind the stock drop.

**One of Mr. Tice's concerns was that investors are overestimating Tyco's true earnings by ignoring the company's history of taking huge "one time" charges after its acquisitions. Tyco's management has encouraged investor confusion**, Mr. Tice alleged, by issuing financial statements that are difficult to unravel.

g.      An article appearing in <u>The New York Times</u> on October 29, 1999, entitled

"At Tyco, Accounting 'Baths' Begin Before the Deals Close," reported as follows (emphasis added):

Tyco International was a **highflying stock** with a reputation for acquiring and improving the performance of companies in distinctly low-flying industries. Then questions were raised about its accounting and the stock began to slip.

In a bravura performance two weeks ago, L. Dennis Kozlowski, the chairman and chief executive, held a teleconference with analysts to defend the company's accounting against questions raised by David W, Tice, a money manager and analyst whose publication, Behind the Numbers, is widely respected. Mr. Tice suggested Tyco might be abusing accounting rules by setting up big reserves when it made acquisitions. Mr. Kozlowski vigorously denied it. "There is,"he said, "no risk that investors will wake up one day and find out there's something wrong."

At the time, I decided not to do a column on Tyco. The company does set up big restructuring reserves for many of its acquisitions, and such reserves are subject to abuse because they can be used to conceal operating expenses. But did Tyco abuse them? There was no proof that it did.

**But it turns out that the questions raised by Mr. Tice are not the only ones that can be raised** regarding Tyco. His questions dealt with what Tyco does after it makes acquisitions. **Perhaps more interesting is the issue of what happens to Tyco's purchases just before the deals close. Call it "The Case of the Hidden Bath**."

The issue is important because Tyco's reputation is based on the improvements it reports in operations after it takes over companies.  **It is famous for cutting costs and increasing revenue. But in two recent purchases - of AMP Inc. and United States Surgical - the companies took big losses just before the acquisitions closed as sales dropped sharply and expenses soared. Those losses were, however, never reported to investors. By the time the reports would have been due, the acquisitions had been completed**.

**"They aren't disclosed clearly**," Mark Swartz, Tyco's chief financial officer, acknowledged in a telephone interview yesterday.

h.      An article appearing in <u>The Wall Street Journal</u> on November 1, 1999, entitled

"Tyco's Accounting Faces Renewed Criticism," reported as follows (emphasis added):

48

Tyco International Ltd.'s shares tumbled more than 9% Friday over **renewed concerns about its accounting practices**, bringing the total decline to about 25% in the past three weeks. The fall has prompted worries that the acquisitive conglomerate might find it more difficult to launch all-stock takeovers. . . .

**The latest concerns revolved around instances in which companies that had agreed to be acquired by Tyco slowed revenue growth or wrote off significant assets just before being folded into the company**. The maneuvers allowed Tyco in later periods to show higher profits and growth rates than it would have done. . . .

i.      An article appearing in <u>The Wall Street Journal</u> on November 8, 1999, entitled

"Worries Continue Over Accounting," reported as follows (emphasis added):

Shares in Tyco International Ltd. continued to be buffeted by **accounting-related jitters** Friday, falling 3.7% in an upward-moving market. Analysts attributed the drop to a report spread by short-sellers that the conglomerate had booked a $15 million aftertax gain on the sale of two units in its fiscal fourth quarter, but hadn't disclosed that item separately in its press release or its investor conference call. The gain amounted to about nine - tenths of one cent per share, adjusted for a subsequent split. Tyco's per-share earnings of 46 cents beat analysts' estimates for the quarter ended Sept. 30 by about 1.5 cents a share.

Although several analysts said the item was too small to be of significance, **some investors were unhappy Tyco hadn't highlighted it in the quarterly release, given the concerns about the firm's accounting practices** that have pushed down its stock about 25% in four weeks.

j.      An article appearing on <u>Bloomberg News</u> on July 27, 2000, entitled "Tyco

Gets Little Critical Research: Call of the Day," reported as follows (emphasis added):

TyCom Ltd. shares began trading today, and investors in its parent company, Tyco International Ltd., may have a difficult time finding critical research from Wall Street firms.

Thirteen firms, including nine of the 10 largest U.S. investment banks by capital, underwrote the $2 billion initial stock sale of TyCom. Eleven have analysts who cover Tyco, and all 17 analysts who follow the company rate it "buy.'

**While the firms' investment banking and brokerage businesses operate independently, analysts may be reluctant to criticize Tyco for fear of losing future business for their firms, some investors and academics said**. . . .

Unwilling to Criticize

49

**In Tyco's case, analysts may be especially unwilling to write critical reports because they know the company plans future share sales**. . . .

"Analysts have to be in with" corporate management, said Bruce Greenwald, who teaches finance and economics at Columbia Business School in New York. "You write a negative report on an important company, and you're going to hear about it both from the company and from your higher-ups."

k.      An article appearing in The Wall Street Journal Europe on March 15, 2001,

entitled "Tyco's Shares Fall Amid Skepticism Over CIT Deal: Stretch From Industrial Base To Finance

Sector Questioned," reported as follows (emphasis added):

Shares of Tyco International Ltd. continued to fall as **investors reacted skeptically to the industrial conglomerate's agreement to buy financial—services concern CIT Group Inc**. . . .

While praising Tyco's deal-making skills, **many analysts questioned the conglomerate's rationale for branching out far from its industrial base, into the commercial-finance sector, where its executives have no expertise**. Others expressed concern about the risks of taking on CIT's business, citing worries about its heavy debt—to-equity ratio and its exposure to the slowing economy.

**"This is a surprising deal" for Tyco**, said Mike Holton, analyst at T. Rowe Price Associates. "**It changes the profile of the company**, and investors probably need some time to assess its ultimate impact."

John C. Thompson, portfolio manager at Thompson Plumb Growth Fund in Madison, Wisconsin, a longtime holder of CIT, expressed similar surprise, saying "**there's no synergy" between Tyco and CIT**. Although delighted that CIT's share price soared on the deal, Mr. Thompson said he hopes a financial buyer such as a large bank or American International Group Inc. will emerge as a counterbidder. "That would make more sense to me."

l.      An article appearing in The Wall Street Journal on July 19, 2001, reported as

follows (emphasis added):

In a move that raised some eyebrows, finance company CIT Group Inc. took $223 million in charges just before being absorbed into Tyco in June, partly to write off bad loans. **Tyco has previously been accused of using such preclosure write-offs to boost results by keeping such charges off its own income statement**.

        m.     An article appearing in <u>The New York Times</u> on January 3, 2002, entitled

"Tyco Shares Decline 2.8% On Talk of a U.S. Inquiry," reported as follows (emphasis added):

> Shares of Tyco International fell 2.8 percent yesterday after a research firm questioned whether Tyco is the subject of a government investigation. . . .
>
> Short sellers of stock, who profit when the share prices of companies fall, **have for years contended that Tyco's accounting practices are overly aggressive, and yesterday's questions seemed to rattle Tyco's shareholders**.

        n.     An article appearing in <u>The Asian Wall Street Journal</u> on January 8, 2002,

entitled "Fall in Tyco Shares Reflects Wariness: Investors Fear Profit Is Too Good to Be True,"

reported as follows (emphasis added):

> A speculative report in an obscure newsletter usually doesn't help to erase 7%, or $8.7 billion, from a big company's market value. But that is what happened to Tyco International Ltd. late last week, after the newsletter SEC Insight Inc. reported the U.S. Securities and Exchange Commission might be taking another look at Tyco's accounting practices.
>
> As it turns out, there isn't a fresh SEC probe, according to a person familiar with the matter. **Still, the sudden stock tumble highlights the market's continuing nervousness about Tyco's accounting. Put simply, investors adore the acquisitive conglomerate's steady earnings growth, but some are afraid the numbers might be too good to be true**. . . .
>
> **The bears concede they can't point to any smoking guns, but say a number of smaller items raise concerns**. For starters, some cite a series of charges by finance company CIT Group Inc. just before the June 1, 2000, closing of Tyco's $10 billion deal to acquire it. The charges depressed CIT's earnings but didn't show up on Tyco's books. CIT's results surged in the first month after Tyco took control.
>
> Tyco has been accused previously by critics of using such preclosure write-offs to boost future results, assertions it has denied. Mark Swartz, Tyco's chief financial officer, says CIT executives made the decision to take the extra charges to account for increasing bad debts and to reflect a plan to exit some businesses. He also says Tyco "specifically disclosed" to investors in a conference call that CIT's results from June 1 through June 30 were artificially high, owing in part to large quarter-end revenue.
>
> **Even so, bears find the numbers curious**. Partly because of a $148 million provision for credit losses, CIT posted a net loss of $78.8 million in its final two months of independence. In the remaining month of its June quarter, after being absorbed by Tyco, the unit posted net income of $71.2 million. CIT's one-month profit added about 1.5 cents

a share to Tyco's June quarter, Mr. Swartz says. For that period, the company beat analysts' expectations of 69 cents a share by three cents, before such items as restructuring expenses. . . .

**Skeptics agree, to a point, but say the company routinely seems able to find earnings from unexpected sources**. Take the fiscal fourth quarter ended Sept. 30, 2001, when Tyco beat expectations by two cents a share, excluding restructuring expenses and acquisition-related charges.

o.      In an article appearing in The Wall Street Journal on January 14, 2002, entitled

"Tyco Stock Drops 8.5% as Investors Await Fiscal First-Quarter Results," reported as follows

(emphasis added):

Tyco International Ltd.'s stock dropped 8.5% Friday, after a fresh spate of rumors fueled investor nervousness about the industrial conglomerate, which is due to report fiscal first-quarter results tomorrow. . . .

Another report making the rounds late last week was that Tyco will report negative free cash flow when it announces its earnings for the quarter ended Dec. 31. **Because the acquisitive Tyco's financial statements are so complex**, many analysts closely track the company's free cash flow -- which the company defines as cash generated from operations minus capital spending and dividends -- as a major indicator of its real earnings power. . . .

**Some Tyco skeptics are concerned that the company has been providing less detail about its results in recent quarters**. In addition to Tycom, the company in mid-2001 ended separate disclosure of the results of its flow-control unit, which makes valves and pipes. Also during the last fiscal year, Tyco combined a number of separate categories on its balance sheet, which some analysts said made it impossible to track some measures of financial health.

p.      An article appearing in The Wall Street Journal on January 23, 2002, entitled

"New Order: Amid Enron's Fallout, And a Sinking Stock, Tyco Plans a Breakup: Giant's Surprise

Move Comes As More Companies Face Push for Clearer Numbers Suffering for Another's 'Sins',"

reported as follows  (emphasis added):

**As the collapse of Enron Corp. triggers widespread investor anxiety about companies with inscrutable finances, giant Tyco International Ltd. -- its stock price**

52

**depressed amid persistent questions about its books -- announced a surprise plan to split into four separate companies**.

The breakup represents a sharp departure from nearly a decade of acquisition-fueled growth that transformed Tyco from an obscure maker of fire- protection devices into one of the world's biggest conglomerates, with $38 billion in annual revenue and a stock-market value of about $95 billion.

The move is an about-face for L. Dennis Kozlowski, Tyco's ambitious chairman and chief executive, who last year said he was aiming for $100 billion in revenues by 2006. Now, Tyco is worth at least 50% more broken up than as a whole, he said. While saying that Tyco's accounting practices are spotless, Mr. Kozlowski told investors that separating the company into smaller, independent entities will offer investors "greatly increased simplicity, clarity and transparency.". . .

**Tyco's breakup marks the latest sign that investors and regulators are demanding more clarity from companies' disclosures to the public. In the wake of the Enron debacle, jittery investors have been fleeing any stock with even a whiff of accounting controversy**. When a wave of fresh accounting rumors about Tyco started soon after Jan. 1, the company's shares tumbled nearly 25% in less than three weeks, wiping almost $30 billion from its market value. That created profits for short sellers, whose trading strategy bets on a stock's decline. . . .

Although the accounting-practice changes were adopted to conform with recent changes in general standards, even some accounting professors were left shaking their heads at the complexity of the results.

Meanwhile, the Bermuda-registered Tyco has also been lowering its taxes and interest costs through a complex international structure that, in part, involves issuing debt through a Luxembourg subsidiary. **Befuddled investors have found themselves wading through numerous lengthy footnotes in an attempt to decipher all of this**. Some wonder how Tyco has been able to report 40% average annual growth in per- share earnings over the last five years with a grab- bag collection of businesses, ranging from disposable diapers to home-alarm systems. . . .

For starters, Tyco critics have said the company has been improving its performance **by having acquired companies take inflated writeoffs and otherwise manipulate their books in their last few months of independence before being gobbled up by Tyco**. This period typically isn't subject to any scrutiny by outsiders because the acquired company usually doesn't file financial statements for the period.

For example, some cite a series of charges by finance company CIT Group Inc. last year in the two months before it was acquired by Tyco. CIT posted a net loss of $78.8 million in its final two months of independence, when investors didn't much care. Then, after being absorbed by Tyco, it posted net income of $71.2 million in the remaining month of its June quarter. Tyco executives have said the accounting was proper, and that they told investors that CIT's one- month results were artificially high owing in part to large quarter-end revenue.

Others have noted **Tyco's seemingly uncanny ability to keep lowering its tax rate**, especially in quarters in which it needs extra income. In last year's fourth quarter, the company reported a tax rate of just 19.2%, down from 24.7% for the first nine months, and 24.2% in the year-earlier period. Tyco has said it had overestimated its tax rate earlier in the year and had to adjust it in the fourth quarter. The lower rate added about five cents per share to earnings in a quarter in which it beat analysts' expectations by two cents.

**Even many veteran money managers have said Tyco's financial statements have been so complex that they didn't understand them fully**. Alfred Harrison, a manager of Alliance Premier Growth Fund in New York, which has $12 billion in assets, including Tyco shares, said recently that "nobody knows how they put it together, but they do." Mr. Harrison likened Tyco's complexity in some senses to Enron, saying "to some degree, they become faith stocks." . . .

Mr. Tice, the Dallas money manager, said yesterday's announcement **suggested a repudiation of the company' strategy of growing through serial acquisitions, financed with a rising stock price and growing debt levels**. "This is essentially Tyco's dream exploding," he said. "The company always wanted to get big -- to grow -- not break up."

About a month and half ago, Mr. Tice also started shorting Tyco shares in his Prudent Bear mutual fund. He said he did so in part because he **believed investors were starting to grow more skeptical of companies with obscure financial statements**. "We just felt like earnings would slow down and that there would be more concern about accounting issues after Enron," he said.

q.      An article appearing in The Wall Street Journal on January 30, 2002, entitled

"Tyco Stock Stumbles 20% in Latest Reaction to Corporate Behavior," reported as follows (emphasis

added):

Tyco International Ltd.'s stock was pounded 20% in extremely heavy trading, as investors reacted harshly to the Bermuda conglomerate's payment to a director for helping the company acquire CIT Group Inc. last year.

The fees, reported in The Wall Street Journal yesterday, were by themselves relatively small -- $10 million for director Frank E. Walsh Jr., and another $10 million to a charity he controls. There were other possible reasons for the stock's decline in a weak market.

**But following earlier questions about Tyco's accounting, and coming in an environment of heightened sensitivity over corporate integrity, the payments were viewed by some observers as a sign of cronyism and poor corporate governance at the company -- and had a powerful effect**. . . .

54

"Right now, anything that has the smell of an Enron, or could be painted in that way, is being hammered," said Jack Ablin, chief investment officer of Harris Trust & Savings Bank in Chicago, which has $30 billion under management and owns Tyco shares.

      r.      An article appearing in <u>The Wall Street Journal</u> on February 4, 2002, entitled

"Tyco Made $8 Billion of Acquisitions Over 3 Years but Didn't Disclose Them," reported as follows

(emphasis added):

> Tyco International Ltd. said it spent about **$8 billion in its past three fiscal years on more than 700 acquisitions that were never announced to the public.**
> **The revelation raises new questions about the completeness of financial disclosures by the conglomerate, which has come under close investor scrutiny in recent weeks for its complex accounting practices**. . . .
> **Mr. Swartz agreed that it would be impossible for an investor to discern the amounts it spent on unannounced deals, because Tyco doesn't provide a crucial piece of information in its regulatory filings: The amount of cash on the balance sheets in companies it acquires**. Tyco subtracts that amount from its total acquisition spending to get the "net" figure, but calculating the unannounced deals requires it to be added back. "You could fault me for that," Mr. Swartz said, adding that the company may include that extra detail in future financial filings. . . .

      s.      An article appearing on <u>Bloomberg News</u> on February 5, 2002, entitled "Tyco

Shares Plunge After Rating Downgrades, Credit Concerns," reported as follows (emphasis added):

> Tyco International Ltd. shares plunged a much as 21 percent on investor concern the conglomerate faces a credit crunch after its debt was downgraded by credit-rating companies.
> Shares of Tyco dropped $6.14 to $23.76 in early trading after dropping as low $23.50. Tyco had already lost about half its market value this year.
> **Standard & Poor's Corp. and Fitch Ratings lowered their ratings on Tyco's $57.1 billion in debt yesterday. S&P cited concern the "uncertainty" regarding its access to the capital markets and the smaller cushion available after the company draws down $5.9 billion in loans to repay $4.5 billion in commercial paper**.

      t.      An article appearing on <u>Bloomberg News</u> on February 14, 2002, entitled

"Tyco Falls After CEO Casts Doubt on Breakup Plan," reported as follows (emphasis added):

Tyco International Ltd. shares fell 7.4 percent after Chief Executive Officer Dennis Kozlowski said there is **no guarantee the conglomerate will complete its breakup plan**.

"The market seems to want to punish them if they break up or if they revise the plan, said James Bitter, an analyst with Wilmington Trust Corp., which manages about $25 billion in assets and is adding to their 1.7 million Tyco shares. . . .

**Tyco is breaking up after being roiled by concerns that the company's accounting hasn't been transparent. Some analysts have speculated that Tyco used $64 billion in purchases since 1993 to mask slowing growth**. Kozlowski, who has denied the allegations, has said the split is the best way to realize shareholder value. Distractions

"We are committed to following though on the plan, " Brad McGee, chief of strategy at Tyco, said today in an interview. "As Dennis said two weeks ago, we're not going to do something stupid. Every plan is subject to market conditions."

u.       An article appearing in <u>The Wall Street Journal</u> on March 5, 2002, entitled

"How Is Tyco Accounting for Its Cash Flow?: Its Touted Measure of Strength Leaves Room for

Interpretation," reported as follows (emphasis added):

Watch the cash flow. That is the advice Tyco International Ltd. and its supporters on Wall Street have given nervous stockholders lately.

But cash flow isn't the immutable measure of financial health that many, in the wake of the rapid collapse of once-seemingly profitable Enron Corp. may think.

Tyco stock is off 44% this year as **investors have questioned the company's accounting practices** and fretted about its access to capital, after the company was forced to draw down on emergency bank credit lines to finance its operations. While defending its accounting as conservative and its liquidity as ample, Tyco repeatedly has pointed to what it characterizes as its strong "free cash flow." Tyco says its free cash flow was $4.8 billion last year, and is expected to be at least $4 billion this year. . . .

**But some accounting specialists fault Tyco for its almost complete lack of disclosure about the purchases**, which it makes from about 2,300 independent dealers around the world who sell the contracts primarily under Tyco's ADT brand name. Mr. McGee agrees that Tyco hasn't separately disclosed any details of its alarm-contract purchases, saying the deals aren't material to its overall results.

      v.     An article appearing on <u>Bloomberg News</u> on April 19, 2002, entitled "Tyco Falls on Concern About SEC Probe; Company Says No Inquiry," reported as follows (emphasis added):

> Shares of Tyco International Ltd. fell 4 percent amid speculation the conglomerate **may be the subject of a Securities and Exchange Commission probe**. Tyco said there isn't an inquiry.
>
> SEC Insight, a private research firm, said the agency denied a request for information in March, according to the firm's newsletter. It made a similar motion in November. Tyco in July 2000 said the SEC ended a probe of its accounting practices and recommended no action be taken.
>
> **Concern about the transparency of Tyco's accounting and more than $64 billion in acquisitions prompted Chief Executive Dennis Kozlowski to announce he'd break up the company in January. Some analysts have speculated that Tyco had companies it acquired take charges and manipulate their cash flow to bolster Tyco's earnings after the transactions closed**. Tyco has disputed the allegations.

      w.     In an article appearing on <u>Bloomberg News</u> on April 25, 2002, entitled "Tyco Ends Breakup; Kozlowski Calls Plan a 'Mistake'," reported as follows (emphasis added):

> Tyco International Ltd. Chief Executive Dennis Kozlowski canceled the breakup of the conglomerate, **saying his idea was a mistake after shareholders lost $41 billion since the plan was announced** . . .
>
> Kozlowski surprised shareholders in January with the plan to break into four companies. Now he has decided to keep the plastics unit he had hoped would fetch about $3 billion in a sale and plans to sell the finance arm, CIT Group, to the public.
>
> He proposed the four-way split, Kozlowski has said, because he thought the company's value wasn't fully reflected in the stock price. The strategy was announced amid upheaval in stock markets stung by Enron Corp.'s collapse and it exacerbated questions surrounding the clarity and validity of Tyco's acquisition accounting, investors said.
> Confidence Lacking
>
> **"It's difficult for investors to have a lot of confidence in Tyco because they keep changing the plan**, " said Andy Palmer, who holds Tyco bonds in the $2 billion of fixed-income assets he helps manage at ASB Capital Management Inc. . . .
>
> Moody's Investors Service Inc. cut its rating on Tyco's $27 billion in bonds because the company won't retire as much debt as expected, Tyco's plan to repurchase shares and the profit forecast revision.

The downgrade to "Baa2'' from "Baal'' put the debt two notches above junk bond levels. Moody's said it retained a negative outlook in the debt as it monitors Tyco's ability to pay off maturing debt over the next 12 to 18 months and convertible debt due in 2003 as well as its ability to sell CIT.

Kozlowski spent more than $64 billion on acquisitions from 1993 to 2001 and spent another $1.45 billion on acquisitions in the fiscal second quarter. Doubts and confusion about acquisition accounting have hung about Tyco since 1999, spurred by newsletters and analysts who questioned certain practices. Tyco has always denied any misleading accounting.

x.       An article appearing in The Wall Street Journal on April 26, 2002, entitled

"Tyco Abandons Plan for Breakup: Loss of $1.9 Billion Posted For Fiscal Second Quarter; Share

Price Tumbles 20%," reported as follows (emphasis added):

Tyco International Ltd. abandoned its ambitious plan to break the huge conglomerate into four parts, sending its stock tumbling 20%.

**The humbling reversal of a course** unveiled just three months ago is seen as an embarrassment for Chief Executive L. Dennis Kozlowski. Tyco also ratcheted downward its earnings expectations yet again for this year and announced a $1.9 billion net loss for the fiscal second quarter due largely to write- downs on failed technology investments. Even ignoring the charges, Tyco reported its first down quarter in a decade amid a sharp downturn in several of its businesses.

The cascade of bleak news was accompanied by a rare apology from the normally hard-charging Mr. Kozlowski, **who admitted the breakup plan was a "mistake" and told shareholders the company's management "has let you down**."

Mr. Kozlowski's "credibility is pretty much shot," said Kevin McCloskey, a portfolio manager at Federated Investors Inc. in Pittsburgh, which owns 5.2 million Tyco shares. "Right now, there's extreme pessimism about this stock."

y.       An article appearing in The Wall Street Journal on June 4, 2002, entitled

"Tainted Chief: Kozlowski Quits Under a Cloud, Worsening Worries About Tyco: Ex-CEO Faces

Criminal Probe Of New York Sales Taxes, Said to Involve Costly Art, Stock Takes a 27%

Shellacking," reported as follows (emphasis added):

The resignation of Chief Executive Officer L. Dennis Kozlowski touched off new doubt about the future of Tyco International Ltd., **an overextended conglomerate that**

**now faces a tricky effort to regain its footing and repay heavy debts amid questions about management integrity**.

The 55-year-old executive resigned abruptly for what the company called "personal reasons." But he had told board members on Friday that he was the subject of a criminal investigation of possible evasion of sales taxes in New York.

At some companies, such a disclosure wouldn't necessarily have been enough to prompt a chief executive's departure. But at Tyco, **which has lost immense credibility this year** -- **and $86 billion in market value** -- amid concerns about strategic flip- flops and aggressive accounting, it was enough to topple Mr. Kozlowski. The Tyco CEO had already been the target of compensation critics for the hundreds of millions of dollars he has reaped in stock and options awards.

z.      An article appearing in The Wall Street Journal on June 13, 2002, entitled

"SEC Reopens Tyco Investigation Company Faces Questions About Its Accounting During Acquisition

Binge," reported as follows (emphasis added):

**The Securities and Exchange Commission reopened an investigation of Tyco** International Ltd. as part of a broad review of possibly questionable corporate accounting in the aftermath of the Enron Corp. collapse.

The agency is looking at whether Tyco used reserves and other bookkeeping strategies to boost financial results following an acquisition binge, according to a person with knowledge of the probe. . . .

New York criminal and SEC investigators also are examining a wide range of expenses by Tyco, including the company's purchase of homes used by executives in New York and Florida. The SEC is also looking to see if Tyco failed to include in its annual regulatory filings any compensation payments to executives, a person familiar with the matter said.

Tyco confirmed yesterday for the first time that the company has been advised that the SEC will open a formal investigation regarding the company's former CEO and other issues. "The company is conducting its own investigation into matters regarding its former CEO and related issues and will cooperate fully with any investigation by the SEC," Tyco said.

120.    Defendants also have known (i) that Defendants made the negligent misrepresentations

alleged in ¶¶ 77, 91-92 and 98 above, (ii) the facts that were negligently not disclosed as alleged in ¶¶

72-76, 85-90 and 94-97 above, (iii) and that these negligent misrepresentations and nondisclosures

would have a negative effect on the price of the Tyco Stock Fund shares and caused the Fund to be an imprudent investment.

121.    Based on the foregoing, Defendants should have terminated the Fund as an investment option, halted the purchase of Fund shares and sold all of the Fund shares.

122.    To the extent that the Defendants possessed material adverse nonpublic information, it should have prevented the Plans from purchasing additional Fund shares. It should also have directed the Plans to sell all Fund shares and disclosed this nonpublic information prior to any sales by the Plans. Had it done so, the Plans would have limited their losses substantially, even though the price might have dropped somewhat upon disclosure.

**The Director Defendants had a duty to monitor the Committee**

123.    The Directors of Tyco International (US) Inc. also had the duty to ensure that their appointees made sure that the Tyco Stock Fund was a prudent investment.  The Directors of Tyco International (US) Inc. should have known that the Tyco Stock Fund was an imprudent investment and should have required its appointees to take all the steps necessary to protect the Plans from its massive losses.

124.    The Directors of Tyco International (US) Inc. breached their fiduciary duties to appoint and monitor the Committee in the following ways:

a.      Upon information and belief, the Directors appointed only Tyco employees who lacked the independence necessary to make appropriate decisions;

b.      To the extent that the appointees did not know the public information alleged in ¶ 119 above which the Directors should have known, the Directors failed to appoint appropriate persons,

failed to monitor them in the performance of their duties and failed to inform them of the information they needed to know to perform their duties;

      c.      To the extent that the appointees did not know the material nonpublic information alleged in ¶¶ 72-77, 85-92 and 94-98, which the Directors of Tyco International (US) Inc. should have known, the Directors of Tyco International (US) Inc. failed to inform their appointees of the information they needed to know to perform their duties.

**Defendants' breach of fiduciary duty caused the loss**

      125.      Defendants were fiduciaries who breached their fiduciary duties in that they should have known the facts as alleged above and should have known that the Plans should not have invested such massive amounts in the Tyco Stock Fund.

      126.      As a consequence of the Defendants' breaches, the Plans suffered losses.

      127.      The Defendants are liable to personally make good to the Plans any losses to the Plans resulting from each breach.

      128.      Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

      129.      Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## PRAYER FOR RELIEF

      WHEREFORE, Plaintiffs pray for:

      A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.      A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.      An Order that Defendants allocate the Plans' recoveries to the accounts of all Participants who had any portion of their account balances invested in the common stock of Tyco International Ltd. maintained by the Plans in proportion to the accounts' losses attributable to the decline in the stock price of Tyco International Ltd.;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable monetary relief

against the Defendants.

DATED: February 3, 2003

By      _____
        Kenneth G. Bouchard, Esq. - NH Bar #51
        Bouchard & Kleinman, P.A.
        369 Lafayette Road
        Hampton, NH 03842
        (603) 926-9333

**SCHATZ & NOBEL, PC**
Robert A. Izard
Andrew M. Schatz
Wayne T. Boulton
330 Main Street, 2nd Floor
Hartford, Connecticut  06106-1851
(860) 493-6292
(860) 493-6290 (fax)

**STULL, STULL & BRODY**
Edwin J. Mills, Esq.
6 East 45th Street
New York, NY 10017
(212) 687-7230
(212) 490-2022 (fax)

**Liaison Counsel for ERISA Plaintiffs**

Lynn Lincoln Sarko
Erin M. Riley
Keller Rohrback
1201 Third Ave., Suite 3200

Seattle, WA 98101
(206) 623-1900

Richard A. Lockridge
Karen M. Hanson
Lockridge, Grindal, Nauen, PLLP
100 Washington Ave. S, Suite 2200
Minneapolis, MN 55401
(612) 340-8290

Russel A. Ingebritson
Ingebritson & Associates
100 South Fifth Street, Suite 450
Minneapolis, MN 55402
(612) 340-8290

Gregory J. Samanko
Gregory J. Samanko. P.A.
Midland Bank Bldg., Suite 644
401 Second Ave. S
Minneapolis, MN 55401
(612) 789-8545

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
(615) 244-2202

Joe R. Whatley, Jr.
G. Douglas Jones
Whatley Drake LLC
2323 Second Avenue North
Birmingham, AL  35202
(205) 328-9576

Mark Mallory
Mallory & Friedman
8 Green Street
Concord, NH 03301
Telephone: 603/228-2277
Facsimile: 603/228-2275

James D. Baskin III
The Baskin Law Firm
300 West 6th Street, Suite 1950
Austin, TX  78701
(512) 381-6300

Eric Lee
Lee & Amtzis P.L.
350 N.W. 12th Avenue, Suite 150
Deerfield Beach, FL 33442
(561) 981-9988

Brian J. Robbins
Jeffrey P. Fink
Robbins Umeda & Fink, LLP
1010 Second Avenue, Suite 2360
San Diego, CA  92101
(619) 525-3990

Ellen M. Kelman
Brauer, Buescher, Valentine,
  Goldhammer, Kelman, & Eckert, PC
1563 Gaylord Street
Denver, CO  80206
(303) 333-7751

James G. Stranch, III
C. Dewey Branstetter, Jr.
Jane B. Stranch
Branstetter, Kilgore, Stranch & Jennings
227 Second Avenue, North, 4th Floor
Nashville, TN  37201-1631
(615) 254-8801

**Attorneys for ERISA Plaintiffs**